UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:08-cv-241-RJC

| | |
|---|---|
| WAYNE CARROTHERS, JR., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ROBERT HUNEYCUTT, et al., )<br>)<br>Defendants. )<br>) | **ORDER** |

**THIS MATTER** comes before the Court on a motion for summary judgment by Defendant Robert W. Huneycutt ("Huneycutt"), (Doc. No. 29), and on a separate motion for summary judgment by Defendants Thomas Barry ("Barry"), Jacqueline King ("King"), J.E. Shields ("Shields"), and Brian Thompson ("Thompson"), (Doc. No. 32).

**I.    BACKGROUND**

A.    Procedural Background

This is an action brought by pro se Plaintiff Wayne Carrothers, Jr. ("Carrothers" or "Plaintiff"). On May 27, 2008, Plaintiff filed this action alleging excessive force against the named Defendants pursuant to 42 U.S.C. § 1983. Defendant Huneycutt was at all times relevant to this action an agent with the North Carolina Alcohol Law Enforcement Authority ("ALE"). Defendants Shield, King, Thompson, and Barry were at all relevant times police officers with the Charlotte-Mecklenburg Police Department ("CMPD"). Plaintiff alleges that his federal constitutional rights were violated during the incidents leading up to and surrounding his

September 14, 2007 arrest for the sale of cocaine and resisting a public officer.[1]

On July 16, 2008, Defendant Huneycutt filed his Answer. (Doc. No. 13). On July 17, 2008, Defendants Shields, King, Thompson, and Barry filed a motion to stay the proceedings until the conclusion of the state court criminal proceedings. (Doc. No. 14). On July 23, 2008, Defendant Huneycutt joined the motion to stay. (Doc. No. 15). On August 4, 2008, Defendants Shield, King, Thompson, and Barry of the CMPD (the "CMPD Defendants") filed their Answer. (Doc. No. 16). On August 25, 2008, this Court entered an Order granting the motion to stay pending resolution of Plaintiff's state court criminal proceedings. (Doc. No. 17). On September 28, 2011, this Court entered an order lifting the stay and requiring that all dispositive motions be filed within thirty days. (Doc. No. 27). On October 27, 2011, Defendant Huneycutt filed a motion for summary judgment. (Doc. No. 29). On October 28, 2011, the CMPD Defendants filed a separate motion for summary judgment. (Doc. No. 32). On January 31, 2012, Plaintiff filed a response to the motions.[2] (Doc. No. 36).

  B. Factual Background

On September 14, 2007, while on duty as a law enforcement officer and ALE agent, Defendant Huneycutt was conducting routine surveillance in Charlotte, North Carolina, at a

---

[1] In an earlier Order, this Court noted that in the underlying state criminal proceedings, Plaintiff entered, on June 4, 2010, an Alford plea to the sale of cocaine and possession with intent to sell or deliver cocaine in exchange for dismissal of charges for resisting an officer and attaining habitual felon status. See (Doc. No. 27). Because the state charges for resisting an officer were dismissed, Plaintiff's allegations of excessive force in this case do not implicate the principles articulated in Heck v. Humphrey, 512 U.S. 477 (1994).

[2] Despite receiving a Roseboro notice with instructions regarding the evidence to be presented on summary judgment, (Doc. No. 33), Plaintiff did not submit any evidence or any legal arguments in responding to the motions. He merely states in his one-page response that he was still trying to contact an attorney to represent him.

location where he had previously made several drug and alcohol arrests. (Doc. No. 29-1: Huneycutt Aff. at ¶¶ 3-4). During his surveillance, Huneycutt observed a vehicle occupied by three persons, including Plaintiff, pull into the convenience store parking lot and park about twenty feet away from Huneycutt's vehicle. (Id. at ¶ 5). After Huneycutt observed from his vehicle Plaintiff engaging in a hand-to-hand drug transaction, Huneycutt approached Plaintiff and identified himself as a law enforcement officer. (Id. at ¶¶ 5-6).

Huneycutt then placed Plaintiff in handcuffs for safety. At that time, Plaintiff told Huneycutt that he had sold drugs and that he had more drugs in his pocket. (Id. at ¶ 7). Huneycutt then placed Plaintiff under arrest and recovered six individually packaged rocks of crack cocaine from Plaintiff's pocket. (Id. at ¶ 8).

Plaintiff then ran from the scene and hid in a heavily wooded area nearby. (Id. at ¶ 9). In response, Huneycutt sought and obtained the assistance of members of the CMPD in order to recapture Plaintiff. (Id.). Defendant King, who was on duty in a patrol uniform and driving a marked patrol vehicle, heard Huneycutt call for assistance, and arrived at around 12:44 a.m. (Doc. No. 32-4: Aff. of King at ¶ 6). King assisted with setting up a perimeter to locate Plaintiff. (Id. at ¶ 7). Defendant Thompson, wearing a patrol uniform and driving a marked patrol vehicle, arrived at the scene at around 12:57 a.m. (Doc. No. 32-3: Aff. of Thompson at ¶¶ 4, 6). Thompson maintained a perimeter around the woods while continuing to monitor the radio traffic of Defendant Officer Shields and CMPD Officer Sossman.[3] (Id. at ¶¶ 7-8).

CMPD canine handler Defendant Shields and his canine Vago were dispatched to the

---

[3] Officer Sossman was originally named in Plaintiff's Complaint but he ceased employment with the CMPD in May 2008 and was never served with the Complaint. (Doc. No. 32 at 1).

3

scene at around 1:04 a.m. (Doc. No. 32-1: Aff. of Shields at ¶ 9). After speaking to Huneycutt and Sossman to determine the direction in which Plaintiff fled, Shields placed Vago on a thirty-foot lead and tracking harness, enabling the canine to track without pressure around the canine's neck, consistent with CMPD policy. (Id. at ¶ 13; Doc. No. 32-5: Malone Aff. at ¶¶ 15, 24). Vago located a track along the wooded area by Arena Drive and Television Drive. (Doc. No. 32-1: Shields Aff. at ¶¶ 13-14). Shields reduced the lead from the original thirty feet to approximately eight feet as the track went up a large hill into the thickly wooded and dense underbrush to better observe Vago. (Id. at ¶ 15). At this point, Vago became entangled in the thick brush and, as Shields attempted to free him from the brush, Vago broke free from Shields by backing out of his tracking harness. (Id. at ¶ 17). Shields immediately called Vago back and ran in Vago's direction while continuing to call him back. (Id.). Within seconds, Officer Shields heard Plaintiff calling for someone to "get the dog off him." (Id.).

Shields saw Plaintiff fighting Vago with one hand, while his other hand was behind his back with one loose handcuff. (Id. at ¶ 18). Officer Shields immediately grabbed Vago from Plaintiff's chest and shoulder area and placed Vago back on the lead. (Id. at ¶ 19). Vago had bitten Plaintiff near his shoulder and chest area. (Id. at ¶ 18). According to Shields, these events occurred "in a matter of seconds." (Id.).

Sossman and Huneycutt arrived and reattached the handcuff to Plaintiff's wrist at around 1:36 a.m. (Id. at ¶ 19; Doc. No. 29-1: Huneycutt Aff. at ¶ 11). The CMPD officers and Huneycutt headed out of the brush and Shields put the lead directly onto Vago's choke collar, rather than putting Vago back in the harness, as the tracking harness was no longer needed. (Doc. No. 32-1: Shields Aff. at ¶ 19; Doc. No. 32-5: Malone Aff. at ¶¶ 15, 24). Sossman and Huneycutt began to move Plaintiff through the underbrush to exit the wooded area. (Doc. No.

4

32-1: Shields Aff. at ¶ 21). While Shields began exiting the wooded area, Vago pulled hard on the lead in the thick brush, causing the clasp of the lead to open. (Id. at ¶ 22). Shields immediately called to Vago to return to Shields. (Id. at ¶ 23). However, Vago was able to engage with Plaintiff and bite him on his left thigh. (Id.). Shields then quickly replaced the lead onto Vago's choke collar and removed him from Plaintiff. (Id.). Vago was engaged with Plaintiff for about ten seconds. (Id.). Medic was immediately called to treat Plaintiff's injuries. (Doc. No. 32-3: Thompson Aff. at ¶ 11; Doc. No. 32-2: Barry Aff. at ¶ 11).

Officer Thompson, who was present as Plaintiff exited the woods, observed that the thick brush, trees, and underbrush made it difficult even for the officers to exit the wooded area. (Doc. No. 32-3: Thompson Aff. at ¶ 10). Defendant Sergeant Tom Barry, who was the on-duty supervisor, responded to the scene per CMPD policy to investigate the use of force due to the canine bites to Plaintiff. (Doc. No. 32-2: Barry Aff. at ¶¶ 6-8). Barry requested that Officers Thompson and King go to the hospital to photograph Plaintiff's injuries. (Id. at ¶ 10; Doc. No. 32-2: Thompson Aff. at ¶ 12). Barry also went to the hospital and spoke with Plaintiff, who admitted he was handcuffed when he fled and that he had tried to remove the handcuffs. (Doc. No. 32-2: Barry Aff. at ¶¶ 12-13).

Plaintiff was transported to Mercy Hospital, where he was treated and released back to Huneycutt, who transported him to the Mecklenburg County Jail that same evening. (Doc. No. 32-1: Shields Aff. at ¶ 24; Doc. No. 32-2: Barry Aff. at ¶ 15).

## II.   STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury

5

could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

### III. ANALYSIS

The Fourth Circuit Court of Appeals recently observed that "[i]t is well-established that all claims that law enforcement officers have used excessive force . . . should be analyzed under

6

the Fourth Amendment and its 'reasonableness' standard, including claims that police canines were improperly deployed." Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 355 (4th Cir. 2010) (emphasis and omission in original) (internal quotation marks and citations omitted). Some of the factors to be considered in determining reasonableness are "'the severity of the crime at issue,' whether the 'suspect pose[d] an immediate threat to the safety of the officers or others,' and whether the suspect '[was] actively resisting arrest or attempting to evade arrest by flight.'" Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989). Ultimately, the standard of reasonableness "is evaluated from the officer's perspective, in recognition of the fact that officers cannot be expected to respond to information they did not possess at the time they acted." Melgar, 593 F.3d at 355 (citation omitted).

      A.     <u>Motion for Summary Judgment by Defendant Huneycutt</u>

Defendant Huneycutt has submitted an affidavit in support of his own motion for summary judgment. In his affidavit, Huneycutt attests that he neither trained nor had any previous contact with Vago, and Vago was not trained to respond to Huneycutt's commands. (Doc. No. 29-1: Huneycutt Aff. at ¶ 20). At no time on September 14, 2007, did Huneycutt maintain or assert any control over Vago, and at no time did Huneycutt cause, encourage, or allow Vago to break loose from its handler, Defendant Shields, or cause pain or injury to Plaintiff. (Id. at ¶¶ 14-15). Furthermore, at no time on September 14, 2007, did Huneycutt or any CMPD officer in any way encourage or command Vago to bite, attack, or engage Plaintiff, and at no time did Huneycutt see any CMPD officer intentionally release Vago from its harness and handler. (Id. at ¶¶ 16-17). Finally, Huneycutt is not now and was not on September 14, 2007, a CMPD officer or a trained handler of law enforcement canines, including Vago. (Id. at ¶¶ 18-19).

7

Case 3:08-cv-00241-RJC   Document 37   Filed 03/26/12   Page 7 of 13

the Fourth Amendment and its 'reasonableness' standard, including claims that police canines were improperly deployed." Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 355 (4th Cir. 2010) (emphasis and omission in original) (internal quotation marks and citations omitted). Some of the factors to be considered in determining reasonableness are "'the severity of the crime at issue,' whether the 'suspect pose[d] an immediate threat to the safety of the officers or others,' and whether the suspect '[was] actively resisting arrest or attempting to evade arrest by flight.'" Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003) (quoting Graham v. Connor, 490 U.S. 386, 396 (1989). Ultimately, the standard of reasonableness "is evaluated from the officer's perspective, in recognition of the fact that officers cannot be expected to respond to information they did not possess at the time they acted." Melgar, 593 F.3d at 355 (citation omitted).

    A.    <u>Motion for Summary Judgment by Defendant Huneycutt</u>

Defendant Huneycutt has submitted an affidavit in support of his own motion for summary judgment. In his affidavit, Huneycutt attests that he neither trained nor had any previous contact with Vago, and Vago was not trained to respond to Huneycutt's commands. (Doc. No. 29-1: Huneycutt Aff. at ¶ 20). At no time on September 14, 2007, did Huneycutt maintain or assert any control over Vago, and at no time did Huneycutt cause, encourage, or allow Vago to break loose from its handler, Defendant Shields, or cause pain or injury to Plaintiff. (Id. at ¶¶ 14-15). Furthermore, at no time on September 14, 2007, did Huneycutt or any CMPD officer in any way encourage or command Vago to bite, attack, or engage Plaintiff, and at no time did Huneycutt see any CMPD officer intentionally release Vago from its harness and handler. (Id. at ¶¶ 16-17). Finally, Huneycutt is not now and was not on September 14, 2007, a CMPD officer or a trained handler of law enforcement canines, including Vago. (Id. at ¶¶ 18-19).

Here, the Court finds that the undisputed facts show that Huneycutt had no control over Vago and finds, therefore, that Huneycutt is entitled to summary judgment as to Plaintiff's claim against him for excessive force.  See Hinds v. Mohr, 56 Fed. Appx. 591, 593 (4th Cir. 2003) (unpublished) (reversing denial of summary judgment in excessive force case with respect to all defendants other than the canine handler, as the canine was at all times under the handler's control, and there was no allegation "that the remaining defendants possessed by virtue of their positions or their training any ability to restrain the dog while it was under [the handler's] command"); Edwards v. High Point Police Dep't, 559 F. Supp. 2d 653, 661 (M.D.N.C. 2008) (granting summary judgment in an excessive force case with respect to an officer who was not the canine's handler, explaining that the officer "had no means to control" the canine and was only providing cover to the handler, who at all times had exclusive control over the canine).  For this reason, Defendant Huneycutt is entitled to summary judgment.[4]

      B.      Motion for Summary Judgment by CMPD Defendants

The CMPD Defendants first note correctly that Plaintiff failed to state in his Complaint whether he has sued the CMPD officers in their individual or official capacities, or both.  A suit against the officers in their official capacities is actually a suit against the municipality for which they work – in this case, Charlotte.  Municipalities are not liable in 42 U.S.C. § 1983 cases under a theory of respondeat superior for the actions of their employees.  To allege a Section 1983 claim against the City, a plaintiff must allege that the municipality, either by an unconstitutional

---

[4] Furthermore, even if Plaintiff could show that Huneycutt had the means to control Vago, which he cannot, Huneycutt has shown that Vago's release was accidental and the unintentional result of Vago breaking free.  Because Vago's release was unintentional, and not the result of any act by Huneycutt, there can be no cognizable Fourth Amendment claim against Huneycutt.

8

policy or custom, caused Plaintiff's injury.  Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658, 694 (1978).  Here, assuming that Plaintiff is attempting to bring a claim against the CMPD Defendants in their official capacities, he has failed to allege a basis upon which the City could be held liable under Section 1983.  Dismissal of the Section 1983 claim is therefore appropriate against the officers in their official capacities.

Next, Plaintiff has failed to present evidence on summary judgment showing that Thompson, King, and Barry were in any way involved in the use of force by Vago, as it is undisputed that they were not canine handlers and had no ability to control Vago.  (Doc. Nos. 32-2: Barry Aff. at ¶¶ 6, 14; 32-3: Thompson Aff. at ¶ 13; 32-4: King Aff. at ¶ 11).  Thompson and King only controlled the perimeter and did not enter the woods where Plaintiff was apprehended.  (Doc. Nos. 32-3: Thompson Aff. at ¶ 7; 32-4: King Aff. at ¶ 7).  It is also undisputed that Barry arrived on the scene only after Plaintiff was bitten, and did not supervise or otherwise oversee the canine handler Shields, or the canine Vago.  (Doc. No. 32-2: Barry Aff. at ¶¶ 9, 11, 14).  Shields was the canine handler and that he was the only person who could, and did, exercise control over Vago.  (Doc. No. 32-1: Shields Aff. at ¶ 27).  Thompson, King, and Barry are therefore entitled to summary judgment on Plaintiff's claim against them in their individual capacities for excessive force.

The only remaining claim is against Shields as the dog handler in his individual capacity. Plaintiff contends that the injuries he received were the result of excessive force from canine bites administered by Vago.  As noted above, a claim of excessive force against police is based on the Fourth Amendment, which guarantees citizens the right to be free from unreasonable searches and should , therefore, be analyzed under a "reasonableness standard."  Graham v. Connor, 490 U.S. at 395.  In determining whether there was an unreasonable Fourth Amendment

9

seizure, the Court must first determine whether was in fact a "seizure" as defined by the Fourth Amendment.

A citizen's right to be free from excessive force begins at the moment they are "seized" by police. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." Brendlin v. Calif., 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted). This "does not extend to 'accidental effects' or 'unintended consequences of government action.'" Shultz v. Braga, 455 F.3d 470, 480 (4th Cir. 2006) (citing Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989)); see also Medeiros v. O'Connell, 150 F.3d 164, 167 (2d Cir. 1998) (finding no seizure in an accidental dog bite and noting that "a seizure requires an intentional act by the party effecting the seizure").

Here, Plaintiff was bitten twice by Vago–first when Plaintiff was hiding from officers and then again when he was brought out of the woods. Plaintiff does not contend, nor does the evidence show, that Vago's actions were based on any command from Officer Shields. (Doc. No. 32-1: Shields Aff. at ¶ 25). Shields contends that he did not intentionally "seize" Plaintiff by releasing Vago on him and there was, therefore, no Fourth Amendment violation. That is, according to Shields, Vago escaped from his harness, and at no time did Shields intentionally release him from the harness. Shields stated that his goal was to have Vago track Plaintiff's scent. (Id. at ¶ 14). Shields states that, as he entered the dense woods with Vago to look for Plaintiff, he instructed Vago to "track," which is the command Shields uses to maintain control of Vago by way of the tracking lead. (Id. ¶ 16). Shields states that he never intended to release Vago from his tracking harness, and that the release was accidental. (Id. at ¶¶ 16, 17). Shields

10

contends that there was, thus, no intentional "seizure" in this case. Cf. Melgar, 593 F.3d at 355 (finding a seizure where a canine was intentionally released to track a missing and intoxicated boy).

This Court first finds that the undisputed evidence shows that there was no intentional seizure in this case. Therefore, the Fourth Amendment unreasonable seizure inquiry ends at this point. The Court further finds that, even if Shields had intentionally released Vago so that Vago could find Plaintiff and contain him, under the facts of this case the seizure would still be reasonable. That is, Plaintiff, a suspected cocaine dealer and arrestee, had fled police and was attempting to escape through thick woods in the middle of the night. The undisputed evidence shows that within seconds of Vago grabbing hold of Plaintiff and biting him for the first time, Shields pulled Vago off of and away from Plaintiff. See (id. at ¶¶ 16-19). Therefore, even if Shields intentionally seized Plaintiff through the use of Vago, the Court finds that, as a matter of law, the force used was reasonable. See United States v. Grogins, 163 F.3d 795, 799 (4th Cir. 1988) (noting strong connection between the sale of drugs and the use of guns to protect those engaged in such criminal conduct). Furthermore, as for the second time that Vago bit Plaintiff, the undisputed evidence shows that Vago, again, escaped by pulling out of his lead in the thick brush. Shields again quickly grabbed Vago and pulled him away from Plaintiff. In sum, the Court finds that there was no intentional seizure in this case and, even if Shields had intentionally seized Plaintiff through the use of the canine Vago, the amount of force used was reasonable under the circumstances. Accord Crenshaw v. Lister, 556 F.3d 1283, 1293 (11th Cir. 2009) (the officers' use of a canine to effectuate the arrest of an armed robbery suspect who had fled through thick woods at night was a reasonable use of force, despite the fact that the canine bit the suspect 31 times before the canine was pulled off of the suspect, and where the suspect

11

suffered serious injuries). Therefore, there was no Fourth Amendment violation in this case.

Finally, even if the Court were to determine that Plaintiff's constitutional rights were violated, Shields would, nevertheless, be entitled to qualified immunity as to Plaintiff's excessive force claim. Qualified immunity protects law enforcement officers in their individual capacities from "bad guesses in gray areas" and ensures that they are held liable only "for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992) (quoting Anderson v. Creighton, 483 U.S. 635, 639-40 (1987)). On September 14, 2007, when Vago bit Plaintiff, it was not clearly established that a Fourth Amendment violation has occurred if a canine escapes from his handler and bites a suspect. See Iko v. Shreve, 535 F.3d 225, 233 (4th Cir. 2008) ("The doctrine of qualified immunity protects government officials from liability for violations of constitutional rights that were not clearly established at the time of the challenged conduct."). Thus, even if the Court were to determine that Defendant Shield's failure to prevent Vago from biting Plaintiff was an unreasonable use of force, Shields would still be entitled to qualified immunity. Thus, Defendant Shields is entitled to summary judgment.

## IV. CONCLUSION

In sum, for the reasons stated herein, Defendants are entitled to summary judgment on Plaintiff's claims against them for excessive force.

**IT IS, THEREFORE, ORDERED** that Defendants' motions for summary judgment, (Doc. Nos. 29; 32), are **GRANTED**, and Plaintiff's action is **DISMISSED** with prejudice.

Signed: March 26, 2012

*[signature]*

Robert J. Conrad, Jr.
Chief United States District Judge

13